**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ANGEL BUTRON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 4:10-CV-0369** |
| | § | |
| **CENTERPOINT ENERGY,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 15) and

Defendant's Motion to Exclude the Report and Expert Testimony of Stephen L. Tate (Doc. No. 17).

Upon considering the Motions, all responses thereto, and the applicable law, the Court finds that the

Motion for Summary Judgment must be granted and the Motion to Exclude the Report and Expert

Testimony of Stephen L. Tate must be granted in part and denied in part.

**I.      BACKGROUND**

Plaintiff Angel Butron ("Plaintiff" or "Butron") has brought claims under the Family  and

Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., against his former employer Centerpoint

Energy ("Defendant" or "Centerpoint") arising out of events immediately preceding the termination

of his employment by Centerpoint.

Prior to his termination, Butron had been employed for approximately twenty years by

Centerpoint. (Angel Butron Dep. 89:4.). In his last position as senior service representative, Butron

responded on an emergency basis to gas leaks, restored service, terminated service, and performed

other maintenance tasks. (*Id*. 18:21-19:13.) Centerpoint provided a company vehicle for Butron's

use and allowed him to keep the vehicle at his home. (Angel Butron Dep. 74:16-19.)

As a senior service representative, Butron was covered by a collective bargaining agreement ("CBA") between his union and Centerpoint. (Lewis Decl. ¶ 3; Lewis Decl. Ex. A.) The CBA contains policies specific to the bargaining unit, incorporates company-wide rules, and allows Centerpoint to establish other rules and regulations that do not conflict with the CBA. (Lewis Decl. Ex. A at 3.) Two such company-wide rules included the "Operating Vehicles on Company Business" policy (the "Company Vehicle Policy") and the "Performance Expectations" policy (the "Employee Performance Policy"). (Lewis Decl. Exs. B, C.) The Company Vehicle Policy authorized Centerpoint's employees to drive company vehicles for specific business needs and prohibits vehicles from being "used for personal business of any type without specific permission from the appropriate member of management." (Lewis Decl. Ex. B at 2.) The Employee Performance Policy states that employees are expected to report to work on every scheduled workday and to personally notify their immediate supervisor if the employee must be absent or tardy, unless a verifiable emergency makes it impossible to do so. (Lewis Decl. Ex. C at 1.) If an employee is unable to reach a supervisor, the employer is required to leave a telephone number where he or she could be reached. (*Id.*) An employee may be immediately terminated for absenteeism for more than three consecutive scheduled days without notice to supervision or unauthorized use of a company vehicle. (*Id.* at 2.) The CBA also contains an "Attendance Control Program" that outlines various types of employee absences, such as illness or personal leave, and the number of points assigned to each type of absence. (Lewis Decl. Ex. D.) Qualified and approved absences under FMLA do not receive points. (*Id.*) Once twenty-three points are accumulated, an employee may be terminated. (*Id.*)

In mid-December 2008, Butron discovered that his wife Maria Butron ("Maria"), a Houston Police Department ("HPD") officer, had an affair with a fellow HPD officer. (Angel Butron Dep. 23:24-24:1, 30:24-25; Maria Butron Dep. 116:15-25.) Butron worked on Tuesday, December 16th without incident. (Lewis Decl. ¶ 6.) He had previously arranged to take vacation days from Wednesday, December 17th to Friday, December 19th. (*Id.* ¶ 6.) His next scheduled day of work was Monday, December 22nd. (*Id.* ¶ 6.)

On December 17th, Butron, accompanied by Maria, confronted the HPD officer with whom Maria had an affair. (Angel Butron Dep. 24:19-25:17, 30:20-22; Maria Butron Dep. 117:1-13.) Butron learned that the affair with the HPD officer had taken place approximately two years prior, but that Maria had also engaged in a second affair more recently. (Angel Butron Dep. 28:24-29:24.) After learning of his wife's extramarital affairs, Butron began to feel irrational and could not think straight. (*Id.* 38:23-24.)

On Saturday, December 20th, Butron skipped a fundraising barbeque for his child's baseball team. (*Id.* 32:12-14, 38:17-18.) By that point, Butron had not slept in several days. (*Id.* 32:13-14.) Butron's father took Butron to see Dr. Robert Castillo, who prescribed Clonazepam. (*Id.* 43:11-44:4.) Dr. Castillo did not diagnose Butron with a psychotic disorder. (Castillo Decl. ¶ 2.) In the late night of December 20th and early morning of December 21st, Butron had a confrontation with Maria. (Angel Butron Dep. 47:21-49:9; Maria Butron Dep. 47:11-48:22.) Butron's brother, Jose Butron ("Jose"), called the police department to report a disturbance. (Angel Butron Dep. 48:1-11.) The police arrived and interviewed Butron and Maria, but did not make an arrest. (*Id.* 49:22-25.)

On Monday, December 22nd, Butron was scheduled to report to work at 8:00 a.m. (*Id.* 55:13-25.) Prior to the start of his shift, Butron called his immediate supervisor, Jezell Lyles ("Lyles"), and told him that he needed a sick day because he wasn't feeling well. (*Id.* 51:13-15, 56:1-57:16;

Doc. No. 22, Ex. B at 2) Butron did not request emergency leave. (Angel Butron Dep. 58:2-59:25; Doc. No. 22, Ex. B at 2) Butron spent December 22nd and some of the following days wandering the streets of Houston and spent at least one night in an abandoned van behind a church. (Angel Butron Dep. 60:23-63:4.) On December 22nd, he attempted to contact his friend Roel Ibarra, a fellow Centerpoint employee, by reporting a fake gas leak and hoping that Ibarra would respond to the leak. (*Id*. 63:20:65:11.) Instead, a Centerpoint employee named Hubert Tigner responded, saw Butron, and realized that the reported leak was bogus. (*Id*. 63:18, 66:22-67:16.)

On the morning of Tuesday, December 23rd, Butron again tried to contact Lyles before his shift to ask for another sick day. (*Id*. 69:12-18.) Lyles was unavailable so Butron spoke to Jose Castro ("Castro"), a crew leader, instead. (*Id*. 69:12-15, 72:24.) Butron asked Castro to let Lyles know that Butron needed another sick day. (*Id*. 73:11-14.) Castro agreed to relay the message. (*Id*. 73:20-21.) Maria also called Lyles to find out whether Butron had gone to work, since, by that point, she was no longer staying with him. (Maria Butron Dep. 143:3-8.) She also told Lyles that she and Butron had an incident on December 21st, that she was no longer staying with Butron, and that Butron did not seem "normal" and was not acting "right." (*Id*. 144:1-5.) Lyles confirmed that Butron had called in on Monday and Tuesday. (*Id*. 143:10-11.) Later that day, Butron went to his ex-wife's workplace, became lost, and asked Maria to pick him up. (Angel Butron Dep. 115:25-116:2.) In Maria's car, Butron told Maria to be quiet and took the battery out of his cell phone because he was afraid that people were following him and that his phone was tapped. (*Id*. 116:2-5.)

On Friday, December 26th, Butron drove in his Centerpoint-owned truck across the United States-Mexico border crossing at Laredo, Texas. (*Id*. 79:3-14, 81:19-22.) Butron had with him only his company-issued identification and some cash, but did not have other identification, his credit

cards, or his cell phone. (*Id*. 82:5-20.) He parked the truck at a bus station on the Mexican side of the border and took a bus to San Luis Potosi, where he stayed with relatives. (*Id*. 80:4-5, 81:1-3.)

At some point over the next several days, Maria again called Lyles to ask whether Butron had called in to work. (Maria Butron Dep. 144:8-20.) Maria told Lyles that Butron had been missing and that no one had heard or seen from him. (*Id*. 144:10-13.) Lyles told Maria that Butron had not called in. (*Id*. 144:24-25.)

Antonio Butron ("Antonio"), Butron's older brother, went to Centerpoint's office and spoke to Lyles in person. (Antonio Butron Dep. 19:7-16.) Antonio asked Lyles for information about his brother and whether he had called in to work. (*Id*. 20:1-7.) Lyles told Antonio that he hadn't heard anything from Butron, but that he had heard something about cheating. (*Id*. 20:16-17, 26:2-3.) According to Antonio, Lyles said that he had noticed Butron acting strangely in the preceding weeks. (*Id*. 26:17-24.) Antonio told Lyles that he believed Butron was having problems and that Butron was in a "schizophrenic mode." (*Id*. 27:1-9.) Lyles told Antonio that Butron was required to come into work on Monday. (*Id*. 30:25-31:2.) Antonio offered to bring in a doctor's note for Butron and Lyles said that he would take a look at the note. (*Id*. 31:3-14.)

Antonio went to the office of Dr. Castillo, who had seen Butron on December 20th, and obtained a note excusing Butron from work until December 31st. (Doc. No. 15, Ex. 7; Antonio Butron Dep. 43:10-13, 44:23-45:4.) Antonio then delivered Dr. Castillo's note to Lyles. (Antonio Butron Dep. 47:21-22.) According to Antonio, Lyles stated that the note was good enough to excuse Butron from work until December 31st. (*Id*. 48:14-16.)

On December 29th, Antonio received a call from a Centerpoint corporate security representative, who asked about the location of Butron's company truck. (*Id*. 40:2-4.) Antonio told the representative that the truck was not at Butron's house, but did not say anything about Butron's

illness. (*Id.* 40:7-12.) Centerpoint filed an auto theft report with the Houston Police Department. (Lewis Decl. ¶ 9.)

Butron eventually called his family. (Antonio Butron Dep. 36:11-13.) Butron's parents and two older brothers visited him in San Luis Potosi and attempted to convince him to return. (*Id.* 85:17-23.) Eventually, on January 5, 2009, Butron returned to the United States alone. (Angel Butron Dep. 86:1, 125:4-8.) He picked up the company truck from the bus station in Mexico and attempted to drive it back to the United States. (*Id.* 86:4-5.) At the checkpoint, federal agents detained Butron and called a Webb County police officer. (*Id.* 86:13-24.) The police officer called Centerpoint to ask about the company truck. (*Id.* 89:1-11; Lewis Decl. ¶ 10.) According to Butron, Centerpoint managers told the police officer that Butron had been terminated, asked the officer to impound the truck, and left it up to the police officer to decide what to do with Butron. (Angel Butron Dep. 89:1-11.) The police officer arrested Butron and took him to Webb County jail. (*Id.* 86:23-87:10.) Maria, her father, and Butron's sister bailed Butron out of jail and brought him back to Houston. (Maria Butron Dep. 122:11-123:5.)

On January 8th, Butron, accompanied by Maria, visited Dr. Marisa Suppatkul in Houston. (Angel Butron Dep. 27:16-19, 36:14-16.) Dr. Suppatkul diagnosed Butron with "Brief Psychotic Disorder" and Adjustment Disorder with anxiety. (Doc. No. 22, Ex. G. at 10-11.) Dr. Suppatkul prescribed Ambien in the event that Butron's anxiety or sleeplessness resurfaced. (Angel Butron Dep. 95:7-9.) Centerpoint officially terminated Butron's employment on this day, effective January 5, 2009. (Lewis Decl. ¶ 11.)

After his return to Houston, Butron called his union's chairman, Freddie Pruitt ("Pruitt"), to determine whether and how he could obtain his position at Centerpoint again. (Angel Butron Dep. 97:12-22.) Pruitt provided Butron with a form to be completed by Dr. Suppatkul. (*Id.* 98:12-18.)

Butron did not call any of his Centerpoint managers or supervisors directly, and did not report to work, on the advice of Pruitt. (*Id*. 106:7-10.) After failing to receive further guidance from Pruitt, Butron called another union representative, Tyson Pradia. (*Id*. 104:22-23, 108:13-14.) Pradia agreed to write a grievance on Butron's behalf, to call Russell Lewis (Centerpoint's North District Operations Manager), and to forward the form completed by Dr. Suppatkal to Centerpoint. (*Id*. 107:10-17; Maria Butron Dep. 134:1-4; Lewis Decl. ¶ 2.) On January 16th, Butron called Russell Lewis on the advice of Pradia to confirm that he had been terminated. (Angel Butron Dep. 125:16-25; Lewis Decl. ¶ 12; Doc. No. 15, Ex. 8.) Butron did not say anything to Lewis during this call about his health condition. (Lewis Decl. ¶ 12; Doc. No. 15, Ex. 8.)

On January 22nd, Butron's union officially filed a grievance on his behalf. (Lewis Decl. ¶ 13.) The grievance explained that Butron had been suffering from a health condition. (*Id*. ¶ 13.) At the conclusion of the grievance proceeding, Centerpoint confirmed that Butron had been terminated for just cause because of his violations of the company's attendance and use of company vehicle policies. (*Id*. ¶ 14.)

Butron filed the present suit against Centerpoint asserting violations of the FMLA and intentional infliction of emotional distress. Centerpoint has moved for summary judgment on Butron's FMLA and intentional infliction of emotional distress claims and to exclude Butron's expert witness. Butron has responded. The motions are ripe for disposition.

## III.   MOTION TO EXCLUDE

Centerpoint has moved to exclude the opinion Butron's expert witness Dr. Stephen Tate, Psy.D., as unreliable due to the purported insufficiency of facts upon which it is based.

### A.  Legal Standard

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. A court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Reliability is analyzed under Rule 702, which requires that: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Experts are permitted to render opinions even if based on inadmissible evidence so long as the inadmissible evidence is of the type reasonably relied upon by experts in that field. *See* Fed. R. Evid. 703; *Daubert*, 509 U.S. at 595. Inadmissible facts or data that serve as a basis for the expert's opinion may not be disclosed to the jury by the proponent of the expert testimony unless a court determines "that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

Further, the expert witness must be qualified "by knowledge, skill, experience, training, or education . . . ." Fed. R. Evid. 702. A court must exclude an expert witness "if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596).

The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met. *Daubert*, 509 U.S. at 593, n.10; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

### B. Analysis

Dr. Tate a licensed clinical psychologist and possesses a Doctor of Psychology (Pys.D.) degree in Clinical Psychology. (Tate Forensic Rep. at 1-2.) He has approximately twenty years of experience providing clinical therapy and psychological testing to groups and individuals in a number of settings. (*Id.* at 2-3.) For example, Dr. Tate serves as a clinical psychologist to the Houston Police Department to serve the needs of police officers and their families, and has provided services to at-risk children, married couples, and the elderly. (*Id.*) Dr. Tate also possesses experience conducting psychological examinations for forensic purposes. (*Id.*)

Dr. Tate's expert report sets out his opinion that, during December 2008, Butron exhibited symptoms that would merit the diagnosis of Brief Psychotic Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, 4th edition ("DSM-IV"). Dr. Tate based his opinion on a few different sources. First, he based his opinion on symptoms that were gathered by a mental health professional from a psychiatric facility in Laredo, Texas. Second, he based his opinion on symptoms that were reported by Butron to Dr. Suppatkul in Houston. (Tate Dep. 29:2-30:24.) Third, his opinion is based on symptoms that were described by Maria in a report to HPD. (Tate Dep. 36:23-37:15.) Fourth, Butron reported these symptoms directly to Dr. Tate beginning in January 2009. (Tate Dep. 42:9-23.) Dr. Tate himself observed "odd" behavior during his initial meeting with Butron. (Tate Dep. 77:3-81:12.) Dr. Tate offers an opinion about the type of behavior displayed by individuals with Brief Psychotic Disorder. He finally offers an opinion about the likely precipitating factors that led to Butron's mental health condition.

Centerpoint seeks to exclude Dr. Tate's opinions on two bases. First, Centerpoint argues that Dr. Tate's opinion that Butron suffered from a "brief psychotic disorder" is not based upon sufficient facts as required by Rule 702. Centerpoint contends Dr. Tate never visually observed and

did not have first-hand knowledge of Butron's condition at any time. According to Centerpoint, Dr. Tate based his opinion on a diagnosis that was provided at the Webb County Jail. However, no mental health professional at the Webb County Jail actually diagnosed Butron with a brief psychotic disorder. In addition, Dr. Tate based his opinion on Dr. Suppatkul's diagnosis of Butron as having suffered a brief psychotic disorder. Such reliance upon the opinion of an undesignated expert like Dr. Suppatkul is improper.

We decline, however, to strike Dr. Tate's opinion on this ground. It is clear from Dr. Tate's deposition testimony that he primarily relied on Dr. Suppatkul's notes, direct observations of Butron's behavior, and Butron's reports of his symptoms, when arriving at the opinion that Butron suffered from Brief Psychotic Disorder. These constitute sufficient facts for the type of diagnosis that Dr. Tate has provided. Any questions regarding "the accuracy and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000). Neither is Dr. Tate's reliance on Dr. Suppatkul's notes and diagnosis improper. Dr. Tate, a clinical psychologist, is within a similar field as Dr. Suppaktul, a psychiatrist. Both routinely diagnose and treat individuals with mental health disorders, though only Dr. Suppatkul is authorized to prescribe medication for those disorders. This is not a case where Butron seeks to introduce Dr. Suppatkul's opinions through an individual who has no knowledge of the relevant specialty. *See Abrams v. Ciba Specialty Chems. Corp.*, 2010 U.S. Dist. LEXIS 19155, 21-22 (S.D. Ala. Mar. 2, 2010). Rather, Dr. Tate is familiar with the methods and reasoning used by Dr. Suppatkul and can independently assess whether Dr. Suppatkul's data are appropriate for his opinion. In addition, Dr. Tate gathered his own data regarding Butron's symptoms and behavior in marital counseling

sessions with Butron and his wife. *See Cooley v. Lincoln Elec. Co*., 693 F. Supp. 2d 767, 781 (N.D. Ohio 2010).

Second, Centerpoint contends that Dr. Tate's opinion that Butron suffered a "serious health condition" under the FMLA is also based on insufficient facts under Rule 702 and was not included in his expert report as required by Federal Rule of Civil Procedure 26. Butron does not make a response regarding this challenge. It is clear from Dr. Tate's expert report that he did not offer an opinion regarding whether Butron's Brief Psychotic Disorder constituted a "serious health condition." Further, his deposition testimony shows that Dr. Tate was unfamiliar with the legal standard that must be met before one qualifies as having a "serious health condition" under the FMLA. For these reasons, we must exclude any opinion that Dr. Tate offers with respect to Butron suffering a "serious health condition" under the FMLA.

## IV.    SUMMARY JUDGMENT LEGAL STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp*., 234 F.3d 899, 902 (5th Cir. 2000). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the movant meets this burden, then the nonmovant is required to go beyond its pleadings and

designate, by competent summary judgment evidence, the specific facts showing that there is a genuine issue for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.   F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)).

## III.    ANALYSIS

Centerpoint moves for summary judgment on Butron's FMLA claims on two separate and independent grounds. First, Centerpoint argues that neither Butron nor his family members gave Centerpoint notice of Butron's alleged need for leave under the relevant FMLA statutory provisions. Due to the failure to provide notice, Centerpoint was entitled to delay or deny protected leave. Second, Centerpoint contends that, even assuming that Butron suffered from an FMLA-covered health condition and provided proper notice of his need for FMLA leave, Butron would have been terminated for his unauthorized use of the Company truck regardless of any FMLA entitlement. In addition, Centerpoint moves for summary judgment on Butron's intentional infliction of emotional distress claim because Butron has available to him common law and statutory remedies for his claims.

In response, Butron argues that there are genuine issues of material fact regarding his entitlement to FMLA benefits and Centerpoint's interference with his FMLA rights. In addition, he

contends that his intentional infliction of emotional distress claim should survive because Centerpoint's conduct was extreme and outrageous.

### A.  FMLA Claim

The FMLA contains two distinction provisions. *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999) (quoting *Bocalbos v. National W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998)). Under the "entitlement" or "interference" provision, the FMLA provides employees with a series of substantive rights and prohibits employers from interfering with, restraining, or denying the exercise of these rights. *See* 29 U.S.C. § 2615(a)(1); *Nero*, 167 F.3d at 927; *Bocalbos*, 162 F.3d at 383. Such entitlements include the right to take unpaid leave for up to 12 workweeks in any 12-month period for covered health conditions and the right to be reinstated to the employee's former position. *See* 29 U.S.C. § 2612(a)(1), 2614(a); *Bocalbos*, 162 F.3d at 383. Under the "discrimination" or "retaliation" provision, an employer is prohibited from discriminating or discharging an employee due to his exercise of FMLA rights. *See* 29 U.S.C. § 2615(a)(2).

Here, Butron contends that Centerpoint denied or interfered with his entitlement to FMLA leave under 26 U.S.C. § 2612(a)(1) and 29 C.F.R. § 825.301(d). Centerpoint contends that Butron has also asserted an entitlement to job restoration under 29 U.S.C. § 2614(a)(1).[1] Although the term "interference" is not defined in the FMLA, DOL regulations explain that "[i]interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220; *Crown v. Nissan North Am., Inc.*, 634 F. Supp. 2d 688, 691 (S.D. Miss. 2009). If an employer interferes with the

---

[1] Butron's complaint also appears to assert a claim of retaliation as a result of his attempts to exercise his FMLA rights: "CenterPoint denied Butron FMLA benefits to which he was entitled and wrongfully terminated him for needing time off for his serious medical illness." (Pl. Orig. Compl. at 6.) However, Butron did not reference a retaliation-based theory in his opposition to Centerpoint's motion for summary judgment. Thus, we find that Butron has abandoned his claim of retaliation in violation of the FMLA. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (plaintiff abandoned theory pleaded in complaint but not raised in opposition to summary judgment motion).

FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). "Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998).

However, as several courts have recognized, the substantive right to reinstatement and the substantive right to medical leave are not absolute. As stated in 29 U.S.C. § 2614(a)(1), the substantive right to reinstatement "shall [not] be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." Courts have extended this limitation on the right to reinstatement to also serve as a limitation on the right to non-interference with medical leave. *See Krutzig v. Pulte Home Corp.*, 602 F.3d 1231 (11th Cir. 2010); *Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003); *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998). "An employee who requests or takes protected leave under the FMLA is not entitled to any greater rights of benefits than he would be entitled to had he not requested or taken leave." *Grubb v. Southwest Airlines*, 296 Fed. Appx. 383, 391 (5th Cir. 2008) (quoting *Serio v. Jojo's Bakery Rest.*, 102 F. Supp. 2d 1044, 1051 (S.D. Ind. 2000)). "An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban*, 345 F.3d at 401; *see also Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002). If an employer can prove that it would have fired the employee for poor performance had the employee not exercised the employee's FMLA rights, the employer will not be liable for interference. *Throneberry v. McGehee Desh Cnty. Hospital*, 403

F.3d 972, 977 (8th Cir. 2005) (employer bears burden of proving whether employee would or would not have been dismissed for reasons unrelated to FMLA leave). The FMLA does not excuse poor performance by an employee even if the problems are caused by the condition for which FMLA leave is taken. *See Grubb*, 296 Fed. Appx. At 383; *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1108 (10th Cir. 2002).

Here, even if we assume that Butron possessed a "serious health condition" and provided sufficient notice to Centerpoint of his need for leave by December 31st, Centerpoint's termination of his employment would have occurred regardless of his request for FMLA leave. By January 8, 2011, when Centerpoint officially terminated Butron, Centerpoint had received notice that Butron had taken his truck into Mexico, in violation of the company's policies. Centerpoint has introduced competent summary judgment evidence that Butron's personal use of a company vehicle is a ground for termination and served as one of the reasons for his termination.[2] Butron has not introduced any facts that raise a "genuine" issue of fact regarding the seriousness of this violation or that it may serve as a ground for termination. He states in his deposition that Centerpoint employees are allowed to use company trucks for routine personal errands performed on the way to or from work. However, he also acknowledges that use of the truck to travel when off-duty for a purely personal trip would not be permitted. (Angel Butron Dep. 77:20-23.) In fact, he admits that taking

---

[2] Centerpoint also introduces competent summary judgment evidence that Butron's violation of the CBA's Attendance Control Program was a separate and independent ground for his termination. Centerpoint contends that Butron did not appear or call in for work on six days (December 26, 29, 30, 31 and January 2 and 5). (Lewis Decl. ¶ 11.) We believe there are factual questions regarding Lyles' approval of Butron's absences on December 26, 29, 30, and 31, based on Antonio's deposition testimony stating that Lyles accepted a doctor's note excusing Butron from work until December 31st. As for Butron's absences on January 2 and 5, these may not have been excused through a doctor's note, but may be characterized as qualifying FMLA leave as a result of the communications from Butron's family members, Maria and Antonio, to Lyles about Butron's situation. We need not resolve whether these communications constitute sufficient notice of the need for FMLA leave, thereby excusing Butron from work on January 2 and 5, because we hold that Centerpoint's other ground for Butron's termination (i.e. violation of the company vehicle policy) precludes him from entitlement to FMLA leave.

15

the truck down to Mexico would violate Centerpoint's policies "[i]f I was in the right state of my mind, thinking straight, yes." (*Id.* 79:20-24.)

Butron has not come forward with any summary judgment evidence to suggest that his firing for unauthorized use of the vehicle would not have happened but for his need for medical leave. *See Arban*, 345 F.3d at 401. He points to internal emails, notes and reports purportedly demonstrating Centerpoint's awareness of his illness and his request for emergency leave. (Doc. No. 22, Ex. B, C, L.) However, these documents do not raise an issue of genuine fact as to the validity of Centerpoint's proffered reason for his termination—i.e., his violation of the vehicle use policy. In addition, they do not suggest that Centerpoint would not have terminated him had he not requested FMLA leave. As such, we find that Centerpoint has met its burden of establishing that its termination of Butron would have occurred regardless of the employee's request for or taking of FMLA leave.

Though Butron argues that the unauthorized use of the truck occurred due to his brief psychotic disorder, courts have repeatedly refused to excuse poor performance that arises out of the same condition that serves as the basis for the FMLA leave. In *Grubb*, the plaintiff, a flight instructor, was fired for sleeping on the job, a condition that the plaintiff alleged was due to his sleep apnea. The Fifth Circuit found, in an unpublished opinion, the plaintiff's termination for poor performance would have been appropriate if he was unprotected by the FMLA, thus extinguishing his right to leave. In *McBride*, the Tenth Circuit found that the termination of an employee due to her failure to process invoices timely, to report to work on time, and to be at her desk during working hours was appropriate under the FMLA even though her poor performance may have been caused by her FMLA-covered depression. In another Tenth Circuit case, *Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723 (10th Cir. 2000), the court upheld the jury finding that the plaintiff

had been terminated for showing up to work drunk, even though the termination occurred after the plaintiff had taken FMLA leave for his alcoholism. In contrast, in *Smith*, the Tenth Circuit found that the termination of an employee who had failed to conduct certain training requested by her employer would not have happened "had she not taken FMLA leave." 298 F.3d at 961. The employer had failed to subject her to serious discipline regarding the alleged deficiencies in her performance and did not formally emphasize the importance of training activities. The evidence allowed an inference that, had Smith been healthy, her employer would have permitted her to continue indefinitely at her job without training anyone. *Id.*

From these cases, we understand that Butron's violations of Centerpoint's vehicle use policy, even though they stemmed from the same root cause as his health condition, may serve as an independent reason for Centerpoint's termination of his employment. It is unfortunate that Centerpoint did not provide Butron, by all accounts a hard-working employee for approximately twenty years, with a greater opportunity to explain and cure his behavior. However, Centerpoint has provided competent summary judgment evidence that Butron was terminated for a valid reason other than his need or requests for FMLA leave. Butron has not controverted this evidence with evidence that raises a "genuine" issue of fact surrounding Centerpoint's decision to terminate his employment. Therefore, we hold that Butron was not entitled to substantive FMLA rights to leave and reinstatement and grant summary judgment to Centerpoint on this claim.

### B. Intentional Infliction of Emotional Distress Claim

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex.

1998). Extreme and outrageous conduct is conduct "'so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community.'" *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)

(quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). Liability does not extend to

mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *GTE Southwest,*

*Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999); RESTATEMENT (SECOND) OF TORTS § 46 cmt.

d (1965). It is for the court to determine, in the first instance, whether a defendant's conduct was

extreme and outrageous. *GTE Southwest, Inc.*, 998 S.W.2d at 616. But when reasonable minds may

differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the

conduct was sufficiently extreme and outrageous to result in liability. *Id.*

      The Texas Supreme Court has recognized that a plaintiff may bring an IIED claim in limited

circumstances:

> "[T]he intentional infliction of emotional distress [is], first and foremost, a 'gap-filler' tort,
> judicially created for the limited purpose of allowing recovery in those rare instances in
> which a defendant intentionally inflicts severe emotional distress in a manner so unusual that
> the victim has no other recognized theory of redress. The tort's 'clear purpose,' we noted,
> was 'to supplement existing forms of recovery by providing a cause of action for egregious
> conduct' that might otherwise go unremedied. We cautioned, however, that the tort was 'a
> 'gap-filler' tort that should not be extended to circumvent the limitations placed on the
> recovery of mental anguish damages under more established tort doctrines."

*Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004) (quoting *Standard Fruit*,

985 S.W.2d at 68) (omitting internal citations). Since an IIED claim is a "gap-filler" tort, it cannot

be used to evade "legislatively-imposed limitations on statutory claims or to supplant existing

common law remedies."  *Id.* An IIED claim cannot be brought when the plaintiff's injuries can be

remedied by existing statutory or common law remedies, even if those avenues are barred.

*Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005) (IIED claim arising out sexual

harassment must be dismissed due to availability of TCHRA remedy, even though plaintiff's TCHRA was time-barred).

Here, the FMLA is available to Butron as a remedy for the allegedly wrongful conduct of which he complains. Although Butron is unable to succeed on the merits of his FMLA claim, we cannot say that FMLA is unavailable to him. As such, an IIED claim cannot be used as a gap-filler tort in this situation. Therefore, the IIED claim fails as a matter of law and we grant summary judgment to Centerpoint on Butron's IIED claim.

## IV.    CONCLUSION

Defendant's Motion for Summary Judgment, (Doc. No. 15), is **GRANTED**. Defendant's Motion to Exclude the Report and Expert Testimony of Stephen L. Tate, (Doc. No. 17), is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

**SIGNED** this the 31st day of May, 2011.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE